CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED
MAY 21 2012
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:12CR00009-4 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| DUSTIN WAYNE ORANGE, | ) | |
| | ) | |
| Defendant. | ) | By: B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3), and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

The Grand Jury returned a multiple-count Indictment charging defendant in Counts One and Four. In **Count One**, defendant was charged with knowingly and intentionally combining, conspiring, and agreeing to possess with the intent to distribute and to distribute: (1) prior to October 21, 2011, a mixture or substance containing a detectable amount of MDMC, MDPV and 4-MEC, controlled substance analogues as defined in Title 21, United States Code, Section 802 (32), with intent for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); and (2) from October 21, 2011 and continuing to the date of the indictment, a mixture or substance containing a detectable amount of MDMC and MDPV, Schedule I controlled substances (by Final Order of DEA, 76 Fed. Reg. 65371), and 4-MEC, a controlled substance analogue as defined in Title 21, United States Code, Section 802(32), with intent for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), all in violation of Title 21, United States Code, Section 846; and in **Count Four** with knowingly and intentionally distributing a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802

(32), knowing the substance was intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

On May 15, 2012, a plea hearing was conducted before the undersigned. The defendant was placed under oath and testified that his full legal name is Dustin Wayne Orange, he was born on May 23, 1985, and he made it to the eleventh grade in high school. The defendant stated that he has a learning disability, but he can read, write, and understand the English language. The defendant further stated that he was fully aware of the nature of the charges against him and the consequences of pleading guilty to those charges. The defendant informed the court that nothing impaired his ability to understand what the court was saying or the nature of the proceedings. The defendant testified that he had received a copy of the Indictment pending against him, and that he had fully discussed the charges therein and any defenses thereto, and his case in general, with his counsel. The defendant stated that he was pleading guilty of his own free will because he was, in fact, guilty as charged in Count One. The defendant testified that he understood that Count One is a felony, and if his plea is accepted, he will be adjudged guilty of that offense. The defendant acknowledged awareness that if he complies with the plea agreement, the government has agreed to move for his dismissal from any remaining counts of the Indictment.

The defendant acknowledged that the maximum statutory penalty for Count One is a $1,000,000 fine and/or imprisonment for a term of twenty years, together with a term of supervised release. The defendant was informed that parole has been abolished, and that if he is sentenced to prison, he will not be released on parole, but on supervised release, a violation of which could result in additional incarceration. Finally, the defendant testified that he understood that, upon conviction, he will be required to pay a mandatory assessment of $100 per felony count of conviction.

The defendant was informed that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining the sentence in a criminal case. The defendant was then informed that the Sentencing Guidelines are no longer mandatory, but the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the Sentencing Guidelines might apply in his case. The defendant also testified that he understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have been given an opportunity to challenge the reported facts and application of the Guidelines. The defendant stated that he understood that the eventual sentence imposed may be different from any estimate his attorney had given him, or any recommendation by the government, and that the court has the authority to impose a sentence that is either higher or lower than that called for by the Guidelines, so long as the sentence is not greater than the statutory maximum for the offense to which the defendant is pleading guilty.

The defendant acknowledged it was agreed that the 2011 edition of the United States Sentencing Guidelines Manual applies to his offenses. The defendant further acknowledged that, in the Plea Agreement, it had been stipulated that Sentencing Guidelines 2D1.1 and 3B1.2(b) are applicable to his conduct. The defendant stated that he understood that even if he fully cooperates with law enforcement, the government is under no obligation to file a motion to reduce his sentence for substantial assistance, and if the government makes the motion, it is up to the court to determine how much of a departure, if any, should be made. The defendant stated that he understood that if he fulfills his duties under the Plea Agreement and accepts responsibility for his conduct, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a), and, if applicable, the government will move that he be given an additional one-level (1) reduction under USSG § 3E1.1(b). The defendant agreed that he had knowingly

and voluntarily waived his rights to request or receive any records pertaining to the investigation or prosecution of his case, including any records that may be sought under the Freedom of Information Act or the Privacy Act of 1974. The defendant agreed he would submit a financial statement, if called upon to do so. He further agreed that from the time of his signing of the plea agreement, or the date he signs the financial statement, whichever is earlier, he would not convey anything of value without authorization from the government. The defendant acknowledged he had agreed to abandon his interest in and had consented to the official destruction or disposition of anything obtained by law enforcement during the course of the investigation.

The defendant acknowledged that he was waiving his right to have a jury determine beyond a reasonable doubt the facts alleged in the Indictment, including any facts related to sentencing. The defendant testified that he understood that he had the right to a trial by a jury, in addition to the following rights, which will be waived or given up if his guilty plea is accepted:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;
4. The right to see, hear and cross-examine witnesses;
5. The right to call witnesses to testify on his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless he voluntarily elects to do so in his own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant testified that he understood that, under the terms of the plea agreement he was waiving his rights to appeal, but that he was not waiving his right to appeal or have his attorney file a notice of appeal as to any issue which cannot by law be waived. The defendant stated he was aware that the government had retained all of its rights to appeal. The defendant acknowledged that he had

4

also agreed to waive his right to collaterally attack any order issued in the case, unless such attack is based on ineffective assistance of counsel.

The defendant testified that he understood that he may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm. The defendant stated that he was satisfied with the advice and representation given to him in this case by his counsel, and that he believed the representation had been effective. The defendant asked the court to accept his plea of guilty to Count One. Thereupon, the defendant was arraigned on Count One and entered his plea of guilty to that count.

**THE GOVERNMENT'S EVIDENCE**

The evidence presented in the government's factual summary is as follows: The offense(s) described below occurred within the Western Judicial District of Virginia. This Statement of Facts briefly summarizes the facts and circumstances surrounding the defendant's criminal conduct. It does not necessarily contain all the information obtained during this investigation and applicable to an accurate Presentence Report and Sentencing Guidelines calculation.

"Bath Salts" first emerged in the United States approximately two years ago. Since then, the use of "bath salts" has increased dramatically, particularly among adolescents and young adults, and has been linked to overdoses, suicides, and deaths throughout the United States. According to the American Association of Poison Control Centers, from January 1, 2011 to December 2011, poison control centers across the United States received 6,138 calls regarding "bath salt" abuse, compared to 302 calls during 2010.

"Bath salts" are mixtures of many different chemicals, including those that resemble cocaine, methamphetamine, and ecstasy. They are classified as synthetic cathinones which are central nervous system stimulants. They are chemically similar to cathinone, a Schedule I controlled substance that

occurs naturally in the khat plant (*Catha edulis*). Users of "bath salts" typically snort the drug in powder form or ingest the drug in pill form, but some users have been known to smoke it, or inject the drug intravenously. A typical user amount of "bath salts" is one half of a gram to one gram. The drug has proven to affect users in a variety of ways, but users typically experience highs similar to those experienced after ingesting MDMA or "ecstasy" (heightening of the senses and sexual arousal), and stimulants like cocaine and methamphetamine (euphoria and increased energy). "Bath salts" have been known to have a number of adverse effects, which include psychotic episodes, violent behavior, delusions, panic attacks, increased heart rate, chest pain, agitation, dizziness, nausea and vomiting.

Packets of "bath salts" are commercially branded with a variety of names and are often labeled "not for human consumption" in an effort to circumvent the federal narcotics laws. Despite these warnings, the sellers of "bath salts" have marketed these substances to consumers as recreational drugs.

In early April of 2011, a family member of an individual addicted to "bath salts" came to the Jefferson Area Drug Enforcement Task Force (JADE) office and notified detectives that "bath salts" were a new illegal drug and were being sold and used in the Charlottesville community. The individual further stated that this substance had horrible physical and psychological side effects and was destroying a member of her family. JADE followed up with the individual's family members and developed a plan to attempt to begin making controlled purchases of this substance. Detectives identified the C'ville Video Store located on 5th Street in Charlottesville, Virginia as a location selling "bath salts." Prior to this investigation there had been no state or federal investigations in the Charlottesville area concerning "bath salts." JADE, utilizing a confidential informant, made a series

of controlled buys from the C'ville Video Store. JADE sent the purchased substances to the state lab in an attempt to document the chemical composition and determine its legality. The substances in the "bath salts" packages purchased by the JADE informant were identified by a chemist at the Division of Forensic Science as: 3,4-Methylenedioxypyrovalerone which is commonly referred to as MDPV; 4-Methyl-ethylcathinone which is commonly referred to as 4-MEC, and 3,4-Methylenedioxymethcathinone which is commonly referred to as Methylone or MDMC.

At that point, after consulting with the Charlottesville Commonwealth Attorney's Office, JADE sought the assistance of the federal Drug Enforcement Administration (DEA) and the United States Attorney's Office for the Western District of Virginia for more information on the substances and how the investigation should proceed. Because of the threat to public safety, a decision was made to commit federal resources to the investigation and attempt to determine where the "bath salts" being sold at the C'ville Video Store were coming from.

The subsequent investigation revealed that Lois McDaniel owns and operates the C'ville Video Store located on 5th Street in Charlottesville, Virginia. Shortly after purchasing the video store in 2011 she began selling "bath salts." McDaniel purchased the "bath salts" from a supplier in New York. The supplier advertised himself as a seller of "bath salts" on the internet. McDaniel would call the supplier's cell phone number to place orders for "bath salts." The supplier would inform McDaniel which varieties of "bath salts" he had in stock and she would choose from the different product options when ordering. The supplier often described which types of his current product options provided the best high or which one most resembled other drugs, including cocaine and ecstasy. McDaniel had the supplier send the shipments of "bath salts" to the C'ville Video Store via Federal Express. McDaniel would then send a money order from the Food Lion grocery store located

7

next to C'ville Video on 5th Street to the supplier in New York. Dustin Wayne ORANGE and one other individual helped McDaniel at the video store and were involved in controlled purchases by JADE confidential informants.

Specifically, between April 2011 and August 2011 JADE, with the assistance of DEA-Richmond, conducted five separate controlled "bath salts" buys from the C'Ville Video Store. These buys were conducted on April 21, 2011 (1.092 grams of MDPV), April 25, 2011 (0.299 grams of MDPV), May 2, 2011 (0.917 grams of MDPV), July 25, 2011, (3.3 grams of MDPV, 0.88 grams of 4-MEC, and 0.83 grams of Methylone or MDMC) and August 11, 2011 (1.25 grams of MDPV). All transactions were captured on audio and video recording equipment.

Under Federal law these three substances, MDPV, MDMC, and 4-MEC, were not Schedule I controlled substances at the time of these controlled. When a substance does not appear on the DEA controlled substance list it is possible that such substance is controlled substance analogue. Title 21, United States Code, Section 813, states that "a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." A substance is a controlled substance analogue according to Title 21, United States Code, Section 802(32) if-

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; and

> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

8

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

All substances from the five controlled buys were sent to the DEA lab in Baltimore, Maryland. In declarations dated February 1, 2012, Thomas DiBerardino, Ph.D, a DEA chemist, found that the chemical structure of the submitted MDPV and 4-Mec was substantially similar to the chemical structure of methcathinone, a Schedule I controlled substance. He also found that the chemical structure of the submitted MDMC was substantially similar to the chemical structure of MDMA (commonly referred to as ecstasy), a Schedule 1 controlled substance. Additionally, in declarations dated February 6, 2012, Cassandra Prioleau, Ph.D., a DEA Drug Science Specialist, found that the pharmacological effects on a user's central nervous system of the submitted MDPV and 4-MEC was substantially similar or greater than the pharmacological effects on a user's central nervous system of methcathinone, a Schedule 1 controlled substance. She also found that the pharmacological effects on a user's central nervous system of the submitted MDMC was substantially similar or greater than the pharmacological effects on a user's central nervous system of MDMA, a Schedule 1 controlled substance.

McDaniel, along with Dustin Wayne ORANGE and one other individual, would sell the "bath salts" out of the C'ville Video Store from behind the counter. ORANGE is the nephew of Lois McDaniel. ORANGE was not an employee of the video store but would visit approximately every other weekend and assist Ms. McDaniel.

9

The sales of "bath salts" were typically not run through the cash register. The product was first located on top of the counter in a display case but was later moved under the counter in a bag in a trash can to conceal its presence. ORANGE knew that the "bath salts" were moved under the counter and into the trash can.

On May 2, 2011, Dustin ORANGE was involved in an undercover sale of "bath salts" to a confidential informant working with the JADE Task Force. The sale took place at the C-Ville Video store though Lois McDaniel was not present. The confidential informant entered the store and indicated a desire to purchase a package of "Wet-n-Wild Bath Salts." ORANGE delivered to the confidential informant the "bath salts" and the confidential informant paid a co-conspirator $60.00 in U.S. currency. After the sale, the co-conspirator placed the "buy" money below the counter and did not ring the transaction through the cash register. This substance was subsequently sent to the Virginia Department of Forensic Science for chemical analysis. By a Certificate of Analysis dated May 23, 2011, the lab identified the substance as .917 grams of MDPV. This controlled purchase was captured by audio and video recordings.

During an interview conducted by JADE detectives, ORANGE acknowledged his involvement in the May 2, 2011 sale of "bath salts" to the JADE confidential informant. He admitted to detectives that he sold the "bath salts" from the store and that he knew customers used them to get high. ORANGE acknowledged knowing that the "bath salts" were illegal and that he tried to convince McDaniel to stop selling them.

**FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

(1) The defendant is fully competent and capable of entering into a plea agreement and making an informed plea;

(2) The defendant is aware of the nature of the charges and the consequences of his plea;

(3) The defendant knowingly and voluntarily entered a plea of guilty to Count One of the Indictment; and

(4) The evidence presents an independent basis in fact containing each of the essential elements of the offense to which the defendant is pleading guilty.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned RECOMMENDS that the court accept the defendant's plea of guilty to Count One of the Indictment. The undersigned DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for July 26, 2012 at 11:00 a.m. before the presiding District Judge in Charlottesville.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within fourteen days could waive appellate review. At the conclusion of the fourteen-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____
United States Magistrate Judge

5/21/12
Date